# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NNCRYSTAL US CORPORATION AND THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ARKANSAS | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | C.A. NO. 19-1307-RGA |
| | ) | |
| v. | ) | **REDACTED PUBLIC VERSION** |
| | ) | |
| NANOSYS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

*Of Counsel*:

Qingyu Yin
Mark Feldstein
Brian Kacedon
Rajeev Gupta
Karthik Kumar
Yieyie Yang
Courtney Bolin
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000
nncrystal-ua-ddel@finnegan.com

Maximilienne Giannelli
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190
(571) 203-2700
nncrystal-ua-ddel@finnegan.com

DATED:  January 30, 2023

Frederick L. Cottrell, III (#2555)
Nicole K. Pedi (#6236)
Tyler E. Cragg (#6398)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
pedi@rlf.com
cragg@rlf.com

*Attorneys for Plaintiffs NNCrystal US
Corporation and The Board of Trustees of the
University of Arkansas*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

I.     INTRODUCTION ............................................................................................................1

II.    DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT SHOULD BE
DENIED.............................................................................................................................1

    A.    Factual Background ...........................................................................................1

        1.    Facts Relevant to Enablement...............................................................1

        2.    Facts Relevant to Infringement of Defendant's Gen 2 and 2.5
Colloidal Nanocrystals ........................................................................6

    B.    Legal Standards...................................................................................................7

        1.    Motions for Summary Judgment ..........................................................7

        2.    Enablement ...........................................................................................7

        3.    Infringement..........................................................................................8

    C.    Argument ............................................................................................................9

        1.    Summary Judgment of Non-Enablement Is Inappropriate ...................9

            a.    *Wands* Factor 1: The Quantity of Experimentation
Necessary ................................................................................9

                i.    Defendant's "quantity of experimentation"
argument is legally erroneous and undermined by
disputed facts ...............................................................9

                ii.    Defendant Relies on Mischaracterized Evidence and
Speculation...................................................................12

                iii.    Enablement does not require addressing all
combinations and permutations ...................................13

                iv.    Defendant's cases involving "unpredictable" arts
are inapposite. ..............................................................15

            b.    *Wands* Factors 2-3: The Amount of Guidance Presented
and the Presence of Working Examples .................................16

            c.    *Wands* Factors 4-7: The Nature of the Invention, the State
of the Art, the relative skill of those in the Art, and the
Predictability or Unpredictability of the Art..................................20

            d.    *Wands* Factor 8: The Breadth of the Claims................................22

        2.    Summary Judgment of Noninfringement Is Inappropriate .......................24

    D.    Conclusion ........................................................................................................26

III.   DEFENDANT'S MOTION TO EXCLUDE SHOULD BE DENIED ............................26

    A.   Factual Background .................................................................................26

        1.   Facts Relating to the Infringing Products Made by Shoei .........26

        2.   Facts Relating to Apportionment ................................................28

    B.   Legal Standard .........................................................................................29

    C.   Argument .................................................................................................30

        1.   Mr. Schoettelkotte Properly Included Infringing Sales in the
            Royalty Base .............................................................................30

        2.   Mr. Schoettelkotte Properly Apportioned ..................................34

            a.   The Apportionment Methodology Used by
                Mr. Schoettelkotte Comports with Federal Circuit
                Precedent ........................................................................34

            b.   Defendant's Criticisms of Mr. Schoettelkotte's Analysis
                Are Meritless ..................................................................36

    D.   Conclusion ...............................................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ajinomoto Co., Inc. v. Archer-Daniels-Midland, Co.*,
   228 F.3d 1338 (Fed. Cir. 2000)....................................................................................18

*Alcon Res. Ltd. v. Barr Labs., Inc.*,
   745 F.3d 1180 (Fed. Cir. 2014)................................................................7, 10, 11, 12

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003)................................................................11, 13, 14, 16

*Amgen Inc. v. Sanofi*,
   143 S. Ct. 399 (2022)....................................................................................11

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................................7

*In re Angstadt*,
   537 F.2d 498 (Ct. Cust. & Pat. App. 1976) ...............................................16, 19

*Atlas Power Co. v. E.I. Du Pont De Nemours & Co.*,
   750 F.2d 1569 (Fed. Cir. 1984)..........................................7, 8, 11, 12, 13, 14, 22

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
   No. 15-152-RGA, 2018 WL 5729732 (D. Del. Nov. 2, 2018) ...............................36

*Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*,
   967 F.3d 1353 (2020)..............................................................................34, 36

*Board of Regents University of Texas System v. Boston Scientific Corp.*,
   No. 18-392-GBW, 2022 WL 17584180 (D. Del. Dec. 12, 2022)....................35, 36

*California Inst. of Tech. v. Broadcom Ltd.*,
   No. CV 16-3714-GW(AGRx), 2019 WL 11828237 (C.D. Cal. June 17, 2019)
   *aff'd in part and vacated in part* 25 F.4th 976 (Fed. Cir. 2022)..............................32

*Carnegie Mellon University v. Marvell Technology Group*,
   807 F.3d 1283 (Fed. Cir. 2015)..............................................................31, 32, 33

*Cephalon, Inc. v. Watson Pharms., Inc.*,
   707 F.3d 1330 (Fed. Cir. 2013)....................................................................7, 8, 12

*CFMT, Inc. v. Yieldup Intern. Corp.*,
   349 F.3d 1333 (Fed. Cir. 2003)........................................................................21

*Chemical Sep'n Tech., Inc. v. U.S.*,
   51 Fed. Cl. 771 (Ct. Fed. Cl. 2002) ...........................................................19

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993).........................................................................29, 30, 31, 37

*Exmark Manufacturing Company Inc. v. Briggs & Stratton Power Prods. Grp.*,
   879 F.3d 1332 (Fed. Cir. 2018).........................................................................36

*Falkner v. Inglis*,
   448 F.3d 1357 (Fed. Cir. 2008).........................................................................18

*Genentech, Inc. v. Amgen Inc.*,
   No. 17-1407-CFC, 2020 WL 708433 (D. Del. Feb. 12, 2020)...............................30

*Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*,
   No. 2:16-cv-00134-JRG, 2017 WL 2869332 (E.D. Tex. May 18, 2017)...............32

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
   831 F.3d 1369 (Fed. Cir. 2016).........................................................................33

*Idenix Pharms. LLC v. Gilead Sciences Inc.*,
   941 F.3d 1149 (Fed. Cir. 2019).....................................................................14, 15

*Invitrogen Corp. v. Clontech Labs., Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005).........................................................................16

*IOENGINE, LLC v. PayPal Holdings, Inc.*,
   No. 18-452-WCB, 2022 WL 2800861 (D. Del. June 15, 2022).......................30, 37

*Karlo v. Pittsburgh Glass Works, LLC*,
   849 F.3d 61 (3d Cir. 2017)...............................................................................29

*M2M Solutions LLC v. Motorola Solutions Inc.*,
   No. 12-33-RGA, 2016 WL 70814 (D. Del. Jan. 1, 2016).....................................33

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
   687 F.3d 1377 (Fed. Cir. 2012).........................................................................14

*Micro Chemical Inc. v. Lextron, Inc.*,
   317 F.3d 1387 (Fed. Cir. 2003).....................................................................30, 37

*Minerals Separation, Ltd. v. Hyde*,
   37 S. Ct. 82 (1916)...........................................................................11, 13, 22, 23

*Nautilus, Inc. v. BioSig Instruments, Inc.*,
   134 S. Ct. 2120 (2014).....................................................................................22

*Pavo Solutions LLC v. Kingston Technology Company, Inc.*,
  35 F.4th 1367 (2022)..................................................................................34, 35

*Pfizer Inc. v. Teva Pharm. USA, Inc.*,
  555 Fed. Appx. 961 (Fed. Cir. 2014) (*unpub'd*)...................................13, 20

*Pharm. Res., Inc. v. Roxane Labs., Inc.*,
  253 F. App'x 26 (Fed. Cir. 2007) (*unpub'd*) .......................................14

*Pineda v. Ford Motor Co.*,
  520 F.3d 237 (3d Cir. 2008)........................................................................29

*Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*,
  711 F.3d 1348 (Fed. Cir. 2013)...................................................................33

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
  75 F.3d 1558 (Fed. Cir. 1996)......................................................................8

*Promega Corp. v. Life Techs. Corp.*,
  773 F.3d 1338 (Fed. Cir. 2014)...................................................................22

*RSB Spine, LLC v. DePuy Synthes Sales, Inc.*,
  No. 19-1515-RGA, 2022 WL 17084156 (D. Del. Nov. 18, 2022) .........35

*Shire ViroPharma Inc. v. CSL Behring LLC*,
  No. 17-414, 2021 WL 1227097 (D. Del. Mar. 31, 2021) .........29, 30, 37

*Sitrick v. Dreamworks, LLC*,
  516 F.3d 993 (Fed. Cir. 2008)......................................................................8

*Standard Havens Products, Inc. v. Gencor Indus., Inc.*,
  953 F.2d 1360 (Fed. Cir. 1991)...................................................................33

*Syngenta Crop Protection v. Willowood, LLC*,
  944 F.3d 1344 (Fed. Cir. 2019)...................................................................33

*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*,
  279 F.3d 1357 (Fed. Cir. 2002)...................................................................25

*Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Elecs. Am., Inc.*,
  895 F.3d 1304 (Fed. Cir. 2018)...............................................................32, 33

*Vectura Ltd. v. Glaxosmithkline LLC*,
  397 F.Supp.3d 579 (D. Del. 2019)..............................................................35

*Vectura Ltd. v. Glaxosmithkline LLC*,
  981 F.3d 1030 (Fed. Cir. 2020)...............................................................34, 35

*Voice Techs. Group., Inc. v. VMC Sys., Inc.*,
    164 F.3d 605 (Fed. Cir. 1999).................................................................................8

*W.L. Gore & Assoc., Inc. v. Garlock, Inc.*,
    721 F.2d 1540 (Fed. Cir. 1983)..............................................................................22

*In re Wands*,
    858 F.2d 731 (Fed. Cir. 1998)..............................................................................8, 11

*Wyeth & Cordis Corp. v. Abbot Labs.*,
    720 F.3d 1380 (Fed. Cir. 2013)..............................................................................15

**Statutes**

35 U.S.C. §112.................................................................................................................11

35 U.S.C. § 271(g)...........................................................................................................30

**Other Authorities**

Fed. R. Civ. P. 56.............................................................................................................7

Federal Rules of Evidence Rule 702..............................................................................29

# I.     INTRODUCTION

The Court should deny Defendant's motions for summary judgment and to exclude testimony. First, Defendant's enablement argument is legally erroneous and material facts underlying all *Wands* factors are disputed. Similarly, Defendant's noninfringement argument presents both a material factual dispute (whether octadecene is a solvent, as used by Defendant) and legal error, as the Court construed the claims such that they do not require a "non-coordinating reaction medium." Third, the testimony of Plaintiffs' expert, Mr. Todd Schoettelkotte should not be excluded. Defendant improperly uses a *Daubert* motion to raise what is really a summary judgment issue concerning infringement under 35 U.S.C. § 271(g), but moreover, Defendant's U.S. sales activities provide more than sufficient evidence for a jury to find infringement. In addition, Mr. Schoettelkotte properly accounted for apportionment in his reasonable royalty analysis.

# II.    DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED

## A.     Factual Background

### 1.     Facts Relevant to Enablement

#1     U.S. Patent No. 7,105,051 ("'051 patent") provides a method of synthesizing colloidal nanocrystals using classes of chemical reagents that were already well-known to a person of ordinary skill in the art ("POSA" or "skilled artisan"), namely, a cation precursor, ligand, non-coordinating solvent, and an anion precursor. Ex. A, ¶¶ 82, 166, 178, 245; Ex. C, ¶¶ 19, 36, 37.

#2     As Plaintiffs' expert Dr. Javier Vela explains, the method of the '051 patent is simple yet elegant. Ex. A, ¶ 5. First, the method is "simple" in that it involves well-known reagents, yet "quite elegant" in that it combines "these well-known reagents in process steps that provide

skilled artisans with the ability to tune the reactivity of cation precursors (through the formation of a cation-ligand complex) and control the synthesis of nanocrystals." *Id.*

#3    The '051 patent describes in detail appropriate reagents for use in the claimed method. *Id.*, ¶¶ 154-271; Ex. Q ('051 patent), 4:28-59, 8:26-19:19. For example, the '051 patent provides guidance on appropriate cation precursors, ligands, and anion precursors for use in the claimed invention (Ex. Q, '051 patent, 4:28-59), the types of ligands that provide the best results for different classes of nanocrystals (*id.*, 13:15-21, 14:57-65), and factors to consider when selecting a non-coordinating solvent (*id.*, 8:64-9:40). As such, the specification provides "ample guidance" on the selection of precursors, ligands, and conditions to synthesizing colloidal nanocrystals using the claimed method. Ex. A ¶¶ 143, 151, 167, 168, 184, 199, 216, 230, 241, 252, 260, 271.

#4    The '051 patent further explains how to optimize conditions to improve the synthesis of nanocrystals, including how to adjust the reaction time, the ligand, and the ratio of the ligand to the cation precursor to tailor the size and size dispersity of nanocrystals. *E.g.*, Ex. Q ('051 patent), 9:41-12:34, 13:22-32, 15:1-32, 18:40-19:19; Ex. A, ¶ 161.

#5    The '051 patent further exemplifies the synthesis of colloidal nanocrystals using the claimed method in seven examples demonstrating adjusting the size of nanocrystals (as depicted in Fig. 1), modifying ligand concentrations to provide either a narrow or broad range of nanocrystals sizes (*see* Fig. 3), using changing the ligand to fine-tune the properties of nanocrystals (*see* Fig. 6), adjusting the cation to ligand ratio to provide nanocrystals with different properties (*see* Fig. 7), and showing how nanocrystal properties change over the course of synthesis (Fig. 10). Ex. Q ('051 patent), 7:10-50, 8:26-19:19. As Dr. Vela explains, "these successful examples

2

demonstrate that the synthesis strategy of using a non-coordinating solvent should be generally applicable for the synthesis of other nanocrystals." Ex. A, ¶ 165.

#6    A skilled artisan would have been armed with extensive prior knowledge pertinent to practicing the claimed invention. For example, a POSA would have already been aware of suitable cation precursors for nanocrystal synthesis (*id.*, ¶ 202), would have already known the properties of cation precursors, including "their reactivities and compatibility with various ligands" (*id.*, ¶ 208), would have had "extensive knowledge of the coordinating abilities of different ligands and the interactions of ligands with various cation precursors" (*id.*, ¶ 222; *see also id.*, ¶¶ 104-07, 220, 221), "would have already understood how to combine cation precursors and ligands to form cation-ligand complexes" (*id.*, ¶ 166), and would have already been "familiar with anion precursors, their properties, and their use in nanocrystal synthesis (*id.*, ¶ 245). As such, skilled artisans with general chemistry knowledge and the guidance of the '051 patent would have been able to select cation precursors, ligands, non-coordinating solvents, and anion precursors to practice the claimed invention. *Id.*, ¶ 175 ("skilled artisans could readily select cation precursors, ligands, and reaction conditions to form cation-ligand complexes"); *id.*, ¶ 189 (addressing non-coordinating solvents); *id.*, ¶ 252 (addressing anion precursors); *id.*, ¶ 199 (addressing temperature); Ex. E (Murray), 8 (explaining that "[s]ince ***the growth of any one NC [nanocrystal] is similar to all others***, the initial size distribution is largely determined by the time over which the nuclei are formed and begin to grow"); *see also* Ex. A, ¶¶ 169, 221, 231, 245, 271.

#7    Such extensive prior knowledge is exemplified in many of the publications discussed by Dr. Vela. *See id.*, ¶¶ 27-38, 62, 82, 105-107, 150, 194, 282. For example, a review published in 2000 summarizes optimized methods of synthesizing nanocrystals of relatively uniform size (called "monodisperse" nanocrystals) and shows that prior to the '051 patent, a skilled

artisan would have been aware of techniques that "reproducibly prepare a homologous size of NC [nanocrystal] samples with rational adjustments of the experimental conditions . . . ." Ex. E, 7. While such techniques were generally performed in coordinating solvents (*see id.*), the '051 patent taught the skilled artisan how to adapt such methods to successfully synthesize colloidal nanocrystals in non-coordinating solvents. Ex. A, ¶¶ 166, 195, 222, 231, 245, 271.

#8     When a skilled artisan synthesizes a nanocrystal, the bulk (non-nanocrystalline) materials "are already known," and the '051 patent provides a method of making these known materials small, on the nanometer scale. Ex. B, 354:5-16; Ex. E, 5-6 (explaining that a nanometer scale material is a smaller version of "the bulk solid" and that "[c]ontrolling the physical size of materials can be used to tune materials properties").

#9     By the time the '051 patent was filed, the field of nanocrystal synthesis was "well-established" and "relatively predictable." *E.g.*, Ex. A, ¶¶ 151, 175, 189, 199, 216, 231, 241, 252, 271. For example, by 2002, "a POSA would have considered the selection of appropriate ligands for nanocrystal synthesis relatively predictable," and little "if any" experimentation would have been required. *Id.*, ¶ 231. As such, skilled artisans generally focused on optimizing nanocrystal synthesis to achieve high-quality nanocrystals, but optimization does not undermine the predictability of selecting appropriate reagents and conditions to practice the claimed invention. *Id.*, ¶¶ 70, 95, 96, 114, 174, 175, 195-99, 211, 215, 221, 227, 231, 241, 268.

#10    In the context of Nanosys's failed attempt to invalidate the '051 patent in IPR2020-00503, Nanosys and its expert Dr. Jonathan Owen admitted that many aspects of nanocrystal synthesis were well-known, routine, and predictable:

- "Methods of synthesizing nanocrystals using ***these same categories of reagents*** (i.e., ***ligand, cation precursor, anion precursor***, and solvent) in the manner disclosed by the '051 patent ***were well known in the art***."[1] Ex. C, ¶ 19.

- Prior to the '051 patent, "artisans routinely used cation and anion precursors in nanocrystal-synthesis reactions" (*id.*, ¶ 29) and "would have considered it ***routine to use various cation precursors and anion precursors*** for synthesizing the corresponding nanocrystals" (*id.*, ¶ 36).

- "A POSA would have ***routinely used ligands*** to stabilize cation precursors and mediate the growth of nanoparticles." *Id.*, ¶ 37.

- A POSA would have understood that the prior art (specifically, a publication by Trentler) exemplified "***the predictability of modifying known methods of synthesizing nanocrystals***." *Id.*, ¶ 179; *see also id.*, ¶¶ 189-90, 197.

- The prior art "discussed in detail numerous methods of synthesizing nanocrystals, wherein ***certain parameters***, such as the reaction temperature, ***were interchangeable and gave predictable results***." Ex. D, 52; *see also id.* 32-33, 42-43, 45.

#11    Highlighting the predictability of the art, the methods of the '051 patent have been used to synthesize numerous colloidal nanocrystals over the years with great success. Ex. B, 190:11-20 ("Looking at column 4 [of the '051 patent] I can tell you that the last 20 years of nanocrystal research relies heavily on these teachings. I can think of many, many different materials that have been made as colloidal nanocrystals thanks to these teachings and this technology."); *id.*, 196:14-18 ("My own group has used it several times and I know multiple groups across the world . . . that have made many nanocrystals using this technology."); *id.*, 201:19-22 ("I don't think the '051 would require you to run any tests to make nanocrystals of a desired material. That has been shown in the literature multiple times."); *id.*, 350:16-352:11 ("Every single time that we tried to use this patent and others have tried to use the patent the guidance is fireproof, it really, really works. It is very foundational."); *see also* Ex. F, ¶ 51.

---

[1] ***Bold italic*** emphasis here is added, unless stated otherwise.

#12     It was reported in 2004—just two years after the inventors published the method of the '051 patent in two high-impact scientific journals—that the "advantages of using a noncoordinating solvent in producing semiconductor nanocrystals ha[d] been illustrated for a wide range of materials." Ex. F, ¶ 45. The authors noted that "on the basis of the success of non-coordinating solvents in producing other high-quality nanocrystals, we adopted many of these existing methods when producing PbSe [lead selenide]." *Id.*; Ex. G, 4 (summarizing synthesis using the method of the '051 patent).

### 2.     Facts Relevant to Infringement of Defendant's Gen 2 and 2.5 Colloidal Nanocrystals

#13     ███████████████████████████████████████████████████████

███████████████████████████████ Ex. F, ¶¶ 63-65, 84-87, Attachment C; Ex. N, ¶¶ 39, 40, 45-49, 117-22; Ex. O, ¶¶ 64-68; *see also* Ex. N, ¶¶ 288-93.

#14     Skilled artisans understand that a solvent may not be the most abundant chemical in a reaction, for example, in mixed solvent systems (reactions with more than one solvent) and/or reactions performed at very high concentrations. Ex. N, ¶ 43. As such, octadecene is a solvent in Defendant's processes, "even if it is not the *only* solvent." Ex. O, ¶ 66.

#15     ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████ *See, e.g.*, Ex. N, ¶¶ 40-41. ███████████████

███████████████████████████████████████████████████████

███████████████████████████████ *Id.*

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



#16

#17

## B.   Legal Standards

### 1.   Motions for Summary Judgment

Summary judgement is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[T]he clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions." *Id.*

### 2.   Enablement

"To prove that a claim is invalid for lack of enablement, a challenger must show by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the claimed invention without 'undue experimentation.'" *Alcon Res. Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, (Fed. Cir. 2014). "That some experimentation is necessary does not preclude enablement;

the amount of experimentation, however, must not be unduly extensive." *Atlas Power Co. v. E.I. Du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984); *see also Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1338 (Fed. Cir. 2013) (noting that "extensive experimentation does not necessarily render the experiments unduly extensive where the experiments involve repetition of known or commonly used techniques"); *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564 (Fed. Cir. 1996).

Factors that may be pertinent to determining whether the level of experimentation is unduly extensive include (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1998).

"Because we must presume a patent enabled, the challenger bears the burden, throughout the litigation, of proving lack of enablement by clear and convincing evidence. Hence, there is no formal burden-shifting framework when addressing the issue of enablement." *Cephalon,* 707 F.3d at 1337–38 (citations omitted).

### 3. Infringement

"Determination of the issue of infringement entails a two step analysis—construction of the claims, a matter of law; followed by application of the claims to the accused device, a question of fact." *Voice Techs. Group., Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 612 (Fed. Cir. 1999) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)).

C.      **Argument**

1.      **Summary Judgment of Non-Enablement Is Inappropriate**

Summary judgment of non-enablement should be denied as Defendant has failed to establish the absence of any disputed material facts regarding whether "one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008). To the contrary, Plaintiffs' evidence demonstrates that a skilled artisan could have readily practiced the full scope of the invention without undue experimentation, as the patent specification provides numerous working examples, the art of synthesizing colloidal nanocrystals was advanced and generally predictable, and the claimed method involved the use of well-known reagents and chemical principles. *Supra*, § II.A.1. Indeed, there are factual disputes for each and every *Wands* factor, any one of which is a basis for denying summary judgment as to all claims.

Further, Defendant provided no arguments on claims 2-6 (which limit the cation precursor), claims 7 and 8 (ligands), claim 12 (anion precursor), claim 18 (which requires synthesizing ZnSe nanocrystals), and claim 19 (which requires synthesizing InP nanocrystals). Each of these claims is narrower than claim 1 of the '051 patent. Summary judgment should further be denied for these dependent claims as Defendant failed to establish any basis for finding them non-enabled.

a.      *Wands* **Factor 1: The Quantity of Experimentation Necessary**

i.      **Defendant's "quantity of experimentation" argument is legally erroneous and undermined by disputed facts**

Defendant's "quantity of experimentation" argument—premised on multiplying known reaction variables that a POSA "***could***" vary—is misguided and cannot establish nonenablement. *See* D.I. 199, 10-12. As the Federal Circuit has explained in reversing on nonenablement, "[a]djusting [chemical reaction] variables may be relevant to *optimizing*…, but [defendant]

proffered no evidence that any experimentation, let alone undue experimentation, with those variables would be necessary in order to *practice* the claimed invention." *Alcon*, 745 F.3d at 1189. Equally, Defendant's speculation of "possible… fail[ures]" (D.I. 199, 12) does nothing to establish "that any claimed embodiments would be inoperable and that a person of ordinary skill in the art would have been unable to practice the asserted claims without resorting to any experimentation, let alone undue experimentation." *Alcon*, 745 F.3d at 1190.

For example, Defendant's "screening tests" argument relies on reaction variables related to optimizing nanocrystal "growth kinetics"[2] and "quality." DI 199, 11. Such optimization is not necessary to practice the claimed invention, which does not require "high quality" or "monodisperse" nanocrystals. D.I. 169 (Order on Claim Construction); *Markman* Transcript (Apr. 7, 2022), 53:17-54:14; *Alcon*, 745 F.3d at 1189. Even if relevant, the '051 patent teaches how to optimize these reaction parameters. *E.g.*, Ex. A, ¶¶ 114,161, 174, 195, 196, 198, 215, 221, 239, 251, 258; *see also* D.I. 100-1 (Decl. of Dr. Vela on claim construction), ¶¶ 70-72; *see also* Ex. B, 190:11-20.

Substantively, Defendant's assertion that a POSA would need to perform "screening experiments" to test "combinations" of known variables (D.I. 199, 10-12) is disputed by evidence showing that a POSA, even prior to reading the '051 patent, would have:

- "already understood how to combine cation precursors and ligands to form cation-ligand complexes" (Ex. A, ¶ 166),

---

[2] Defendant's characterization of the patent as teaching that "'dramatic' changes that can result in varying ligand concentration" as evidence of nonenablement (D.I. 199, 11) is particularly misleading. The patent teaches that what's "dramatic" is "[t]he influence of OA ligand concentration on the ***growth kinetics***" (Ex. Q, '051 patent, 11:11-32) and demonstrates nanocrystal formation under *all* conditions. *See* D.I. 100, Ex. 1, ¶¶ 70-72 (showing formation of nanocrystals at all ligand concentrations).

- possessed "general prior knowledge of chemistry (including the reactivity of precursors and the strength of ligands)" (*id.*, ¶ 231),

- known "established temperatures for nanocrystal synthesis" (*id.*), and

- already been "familiar with anion precursors, their properties, and their use in nanocrystal synthesis" (*id.*, ¶ 245).

Moreover, following the guidance of the '051 patent, a POSA would have been able to select a non-coordinating solvent without experimentation (*id.*, ¶ 189). For example, Dr. Vela explained that practicing the '051 patent would not "require you to run any tests to make nanocrystals of a desired material. That has been shown in the literature multiple times." Ex. B, 201:19-22; *see also supra*, § II.A.1.#11-#12.

Even if Defendant's assertion that screening experiments would have been necessary was undisputed, "[e]nablement is not precluded by the necessity for some experimentation such as routine screening," *Wands*, 858 F.2d at 736–37. Where, as here, the art is grounded in well-known scientific principles, skilled artisans may "select" appropriate combinations, consistent with their level of skill and knowledge. *Wands*, 858 F.2d at 736–37; *Alcon*, 745 F.3d at 1190; *Atlas Power*, 750 F.2d at 1572; *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334-37 (Fed. Cir. 2003); *Minerals Separation, Ltd. v. Hyde*, 37 S. Ct. 82, 86 (1916); *supra*, § II.A.1. Routine screening combinations and permutations may be unduly extensive—if ever[3]—only when practicing unpredictable arts. *See* § IV.A.1.d, below.

---

[3] The Supreme Court recently granted certiorari to consider *"*[w]hether enablement is governed by the statutory requirement that the specification teach those skilled in the art to *'*make and use*'* the claimed invention, 35 U.S.C. §112, or whether it must instead enable those skilled in the art *'*to reach the full scope of claimed embodiments*'* without undue experimentation—i.e., to cumulatively identify and make all or nearly all embodiments of the invention without *'*substantial time and effort.*'"* *See Amgen Inc. v. Sanofi*, 143 S. Ct. 399 (2022) (No. 21-757).

### ii.    Defendant Relies on Mischaracterized Evidence
###          and Speculation

While insufficient as a matter of law even if true, Defendant's "quantity of experimentation" position rests on unsupported assertions and mischaracterized evidence.

Defendant cites to testimony of Dr. Vela to argue that experimentation would be "time consuming, expensive, and complex." D.I. 199, 10. Asked if gallium oxide was a "possible" cation precursor, Dr. Vela explained that, to make gallium-based nanocrystals, one would have been guided to use gallium acetate or gallium chloride as cation precursor. Ex. B, 348:11-350:7, 352:20-353:3. That he ***did not "know"*** if gallium oxide would work" as the cation precursor is immaterial as Defendant bears the burden of proving inoperability. *Alcon*, 745 F.3d at 1190 (reversing summary judgment of nonenablement where defendant "did not show that any claimed embodiments would be inoperable"); *Atlas Power*, 750 F.2d at 1577. That his students' time was "expensive" does not indicate that any experimentation would have been "complex," unduly extensive, or non-routine. In fact, Dr. Vela's testimony shows the opposite. *E.g.*, *supra*, § II.A.1.#11; Ex. B, 190:11-20, 196:14-18, 350:16-352:11; *see also Cephalon*, 707 F.3d at 1336-1338 (Even "extensive experimentation does not necessarily render the experiments unduly extensive where the experiments involve repetition of known or commonly used techniques.").

Defendant mischaracterizes Dr. Vela's testimony to imply that a POSA would need to perform an "experiment" to determine if a cation-ligand complex exists. D.I. 199, 10. Dr. Vela explained that "one hallmark" of the formation of a cation-ligand complex involves the solubilization of an insoluble precursor. Ex. A, ¶ 163. This is an observation in the '051 patent, not an experiment. *Id.* As Dr. Vela repeatedly explains, a POSA would have already known how to form a cation-ligand complex and would have been able to "select and combine the appropriate

12

cation precursors, ligands, and non-coordinating solvents to form cation-ligand complexes without undue experimentation." *Id.*, ¶ 166.

Finally, Defendant argues that "*if* a cation ligand complex is formed, a POSA would then experiment with different temperatures to determine *if* a nanocrystal is formed." D.I. 199, 10. In addition to being unsupported, it is disputed by Dr. Vela's explanation that a "POSA would have been readily able to identify a temperature sufficient to form nanocrystals following the guidance of the '051 patent." Ex. A, ¶ 193. For example, it was known that "high quality semiconductor nanocrystals are typically synthesized at high temperatures." *Id.*; *see also* Ex. E (Murray).

### iii.   Enablement does not require addressing all combinations and permutations

Defendant contends that "selecting a set of compounds" and "varying the concentrations of the selected chemicals" is "the archetype of undue experimentation." DI 199, 11. Not so. *Pfizer Inc. v. Teva Pharm. USA, Inc.*, 555 Fed. Appx. 961, 967 (Fed. Cir. 2014) (*unpub'd*) ("Where a claim has been construed to cover a chemical compound, the specification is not deficient merely because it does not disclose how to prepare a particular form or mixture—among hundreds of possible permutations—of that compound."); *Minerals Sepn.*, 37 S. Ct. at 86 (explaining that work implementing the invention is permissible, provided the specification guides "those skilled in the art to its successful application"). *Atlas Power* and *Amgen* are particularly instructive here, as they considered and definitively rejected Defendant's position.

The *Atlas Power* patent claimed an "emulsion blasting agent" consisting of certain classes of materials, including "a carbonaceous fuel forming a continuous emulsion phase" and "a water-in-oil type emulsifying agent." 750 F.2d at 1572. The defendant argued that the claims were overbroad, asserting that the patent lacked "commensurate teachings as to which [component] combinations would work." *Id.* at 1576. The district court, affirmed by the Federal Circuit, rejected

these arguments and found that a POSA "would know how to select a salt and fuel" and then apply "a basic principle of emulsion chemistry" to determine the proper emulsifier. *Id.*

In *Amgen*, the Federal Circuit affirmed defendant's failure to establish nonenablement of a claimed method of producing human erythropoietin (EPO) that required, *inter alia*, "growing, under suitable conditions, vertebrate cells comprising promoter DNA…." 314 F.3d at 1332, 1334-37. While the patent did not detail how to modify ***all*** vertebrate cells according to the claimed method, the Federal Circuit nonetheless held the claims enabled in view of district court's finding that "for those skilled in the art, it was a relatively simple matter to determine whether a certain promoter would work within a specific vertebrate cell, whether a particular vertebrate cell would produce human EPO in culture, and whether a particular promoter could be operatively linked to control the transcription of the human EPO DNA." *Id.* at 1336-37. Notably, the Federal Circuit did not deem it necessary for the specification to establish all DNA and vertebrate cell combinations would work. *Id.* at 1336-37. Nor was the total cumulative time to evaluate all such combinations even considered as a factor.[4] *Id.*

Consistent with *Atlas Powder* and *Amgen*, Plaintiffs' evidence shows that a skilled artisan could readily select appropriate reagents and conditions to practice the claimed method. *Supra*, II.A.1.#3-#7. Like *Amgen*, rather than making combinations randomly, selecting conditions for a POSA would have been "a relatively simple matter" by reliance patent's guidance and prior art knowledge. *C.f.* D.I. 199, 11; *supra*, § II.A.1.#3-#8. In short, "any gaps between the disclosures and the claim breadth could be easily bridged" by a skilled artisan. *Amgen*, 314 F.3d at 1336.

---

[4] As of 2012, the New World Encyclopedia reported that over 50,000 vertebrate species had been described. See https://www.newworldencyclopedia.org/entry/Vertebrate.

### iv.   Defendant's cases involving "unpredictable" arts are inapposite.

Defendant heavily relies on readily distinguishable cases that turned on the unpredictability of claimed biological activity.[5] *See* D.I. 199, 11-12.

First, the claims in *Idenix Pharms. LLC v. Gilead Sciences Inc.*, 941 F.3d 1149, 1159 (Fed. Cir. 2019), were directed to methods of treating hepatitis C virus (HCV) where the field of modifying compound for such activity was, according to patent owner's expert, "in its infancy," "unpredictable," and required testing of each individual compound. The court determined that non-enablement was evidenced by the unpredictable nature of anti-HCV activity and the related need to test each of the billions (or at least the "many, many thousands of 2'-methyl up nucleosides" disclosed as preferred) of claimed compounds for this unpredictable biological activity. *Id.*, 1159. Notably, it came to the opposite conclusion when discussing *chemical synthesis*:

> Because a jury could only have found that *synthesis of many 2'-methyl-up nucleosides was necessary*, *but* could have concluded that synthesis of an individual nucleoside was *largely routine*, this factor *weighs against a finding of non-enablement*.

*Id.* at 1160. In sum, non-enablement was based on the unpredictable nature of biological activity—not simply the breadth of the claims or need for "largely routine" chemical synthesis.

Second, *Wyeth & Cordis Corp. v. Abbot Labs.*, 720 F.3d 1380, 1382, 1385 (Fed. Cir. 2013), similarly concerned the hunt for unpredictable biological activity, specifically with respect to a

---

[5] Defendant's other cases are also inapposite. *See Pharm. Res., Inc. v. Roxane Labs., Inc.*, 253 F. App'x 26, 29, 30 (Fed. Cir. 2007) (*unpub'd*) (affirming non-enablement of an "highly unpredictable" invention, where the inventor made "numerous unsuccessful attempts" to practice the invention); *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012) (affirming non-enablement where claims encompassed "resistance changes beyond 120% and up to infinity," yet expert testimony indicated that at most, the patent at issue suggested a resistive change of between 100% and 120%, i.e., the "lower end of the claim scope).

method of treating or preventing restenosis in a mammal using a genus of "rapamycin" compounds. It was undisputed that the art was unpredictable, that the specification was silent about modify a compound "in a way that would preserve the recited utility," and that testing of each compound would have been required to determine activity. *Id.* 1384-1385. *Wyeth* concluded that the "need to engage in a systematic screening process for each of the many rapamycin candidate compounds is excessive experimentation" where the specification offered no guidance regarding which modifications might work.[6] *Id.*

Here, in contrast to *Idenix* and *Wyeth*, the invention involves predicable chemical synthesis using well-known reagents and no considerations of unpredictable biologic activity. *Supra*, § II.A.1.#9-#12. As such, skilled artisans could have readily applied well-established principles of chemistry and nanocrystal science and, following the guidance of the '051 patent, practiced the claimed method to synthesize colloidal nanocrystals.

In view of the parties' material disputes concerning *Wands* factor 1, summary judgment in Defendant's favor is not warranted.

> **b.      *Wands* Factors 2-3: The Amount of Guidance Presented and the Presence of Working Examples**

Defendant failed to establish the absence of material factual disputes regarding the amount of guidance presented in the patent and its working examples, arguing without support that "[t]he '051 patent does not provide guidance on how to select an appropriate ligand, cation precursor or anion precursor." D.I. 199, 13-15. To the contrary, Defendant concedes that "[t]he '051 patent lists large categories of potential ligands that are used in a 'typical' preparation" (*id.,* 13), that "the '051 patent provides seven working examples" (*id.,* 14), and that Dr. Vela has opined "that 'the patent

---

[6] In *Wyeth*, the synthetic steps were also not routine, requiring instead "a complicated and lengthy series of experiments in synthetic organic chemistry." *Id.* at 1386.

provides very detailed and specific guidance on picking an ***appropriate*** cation precursor'" (*id.*, 15 (quoting D.I. 200, Ex. 1, ¶ 203, emphasis in original)). Defendant further ignores that even one or two examples—*here there are seven*—may enable a broad genus in a relatively predictable field of art, as is the case here.[7] *Amgen*, 314 F.3d at 1338; *In re Angstadt*, 537 F.2d at 502 (noting that "the scope of enablement varies inversely with the degree of unpredictability involved); Ex. A, ¶¶ 175, 189. Moreover, as detailed below, Plaintiffs dispute every material aspect of Defendant's alleged facts and its characterization of Dr. Vela's opinions.

Disputing Defendant's assertion that the seven working examples provide no guidance "other than the exact compounds used in the examples" (D.I. 199, 14), Plaintiff's evidence shows that the patent provides sufficient guidance for skilled artisans to extrapolate—as they in fact did— from the specific examples to prepare other colloidal nanocrystals. *See* Ex. A, ¶¶ 155-232, 243-253, 271; *supra*, § II.A.1.#11-#12.

For example, with respect to cation precursors, the patent specifically identifies compounds of Group II metals (Zn, Cd, Hg), Group III metals (Al, Ga, In), Group IV metals (Ge, Sn, Pb), and transition metals and explains that such compounds "can constitute a wide range of substances," including, e.g., oxides, halides, and carboxylates. Ex. Q ('051 patent), 4:28-42. Given that a skilled artisan would have understood that cation precursors in the same "family" behave in a similar way, a skilled artisan would have understood the '051 patent to provide guidance applicable to chemical

---

[7] Even in an *unpredictable* art, a specification need not disclose "a test with every species covered by a claim," as this would require an inventor to "carry out a prohibitive number of actual experiments." *Id.* (emphasis in original); *see also Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052 (Fed. Cir. 2005) ("Enablement does not require the inventor to foresee every means of implementing an invention at pains of losing his patent franchise."). Thus, even where the art is unpredictable, "the performance of trial runs" may be "'reasonable,' even if the end result is uncertain," and the inventors should be permitted to "claim as their invention the broad range of processes which they have discovered." *In re Angstadt*, 537 F.2d 498, 504 (Ct. Cust. & Pat. App. 1976).

families beyond its specific working examples. *See* Ex. B, 198:2-24, 201:5-7, 348:14-19 (explaining that one would be guided to use gallium acetate as a precursor based on the patent's use of indium acetate or gallium chloride based in the prior art's use of that precursor). Indeed, the '051 patent demonstrates and additional evidence shows that claimed synthesis should be "generally applicable" for the synthesis of a "wide range" of colloidal nanocrystals, including lead selenide (PbSe). Ex. A, ¶ 165; Ex. G (Yu), 4.

Contrary to Defendant's assertion that the '051 patent "does not provide any guidance on how to select an appropriate ligand for a specific combination of chemicals" (D.I. 199, 13-14), it provides both overarching guidance on and specific examples of suitable ligands. *Supra*, § II.A1.#3-#5. For example, the specification teaches that "[i]n a typical preparation, the ligand is selected from fatty acids, amines, phosphines, phosphine oxides, or phosphonic acids." Ex. Q ('051 patent), 4:42-44. The patent further explains that "numerous" ligands worked for the synthesis of CdSe, CdS, and CdTe nanocrystals (*id.*, 13:16-20) and that fatty acids typically worked best for ZnSe, InP, and InAs nanocrystals (*id.*, 12:54-65, 14:57-15:32, 16:23-19:19).

The specification also models adjusting ligand concentrations and ratios to obtain relatively uniform size nanocrystals in a model system. Ex. Q ('051 patent), 10:23-12:34, Figs. 1-3. And, as succinctly stated in the '051 patent, a skilled artisan would have been able to "***readily and empirically correlate the change in reaction parameters to resulting nanocrystal size and size distribution*** in the same way that FIGS. 1–3 demonstrates for CdS." *Id.*, 10:64-11:1; Ex. A, ¶ 251. While such optimization is not required to practice the claimed methods, the detailed discussion provides valuable guidance regarding ligand concentrations and ratios. Ex. A, ¶ 221.

The patents disclosures on appropriate ligands, concentrations, and ratios are necessarily understood through the eyes of a skilled artisan, who was familiar with ligands, their properties,

and forming cation-ligand complexes therewith. *Supra*, § II.A.1.#6-#8; *c.f.* D.I. 199, 13; *Falkner v. Inglis*, 448 F.3d 1357, 1365 (Fed. Cir. 2008) ("A patent need not teach, and preferably omits, what is well known in the art."); *Ajinomoto Co., Inc. v. Archer-Daniels-Midland, Co.*, 228 F.3d 1338, 1347 (Fed. Cir. 2000) ("A patent… presumes a readership skilled in the field of the invention.").

Similarly, Plaintiff's evidence disputes Defendant's assertion that "the '051 patent does not describe in what situations to select certain types of anion precursors." D.I. 199, 14. As explained by Dr. Vela, selecting an anion precursor would have been a routine matter in view of the patent's guidance:

- the skilled artisan was "already familiar with anion precursors, their properties, and their use in nanocrystal synthesis" (Ex. A, ¶ 245),

- the '051 patent then "expressly names the appropriate types of chemicals that should be suitable anion precursors for the claimed methods" (*id.*), and

- the '051 patent further provides guidance on the appropriate stoichiometries to use (e.g., the ratio of the cation precursor to the anion precursor) (*id.*, ¶¶ 249-52).

Based on this, the patent's guidance "would have been more than sufficient" to guide a skilled artisan to the successful use of the claimed method and in fact has been used to prepare a wide range of materials with great success.[8] *Id.*, ¶ 250; *supra*, § II.A.1.#11-#12.

Defendant again mischaracterizes Dr. Vela's testimony on gallium oxide. D.I. 199, 15. Dr. Vela explained that the patent would have guided a skilled artisan to use an acetate precursor for gallium, such that it would not be necessary to try gallium oxide. Ex. B, 348:11-349:11. While it

---

[8] Defendant is mistaken that Dr. Vela "ignores that the claims require ***four*** different compounds that have to work ***together*** to form a nanocrystal." D.I. 199, 15. While Dr. Vela directly rebutted arguments presented by Dr. Owen, who attacked various aspects of the invention piecemeal, he repeatedly explained that a skilled artisan could readily select combinations of reagents and conditions to successfully practice the claimed method using the patent's guidance. *E.g.*, Ex. A, ¶¶ 154, 164, 166, 169, 189, 193, 199, 231, 259, 260, 271.

is immaterial whether a skilled artisan would have known with certainty how to use gallium oxide specifically, it is material that Defendant has not cited any evidence that gallium oxide would ***not*** work as a cation precursor or identified ***any*** nanocrystal that could not be synthesized using the claimed method. *See In re Angstadt*, 537 F.2d at 504. "Here, like the Carrollian Jabberwock, the nonenabling examples cited by defendant's expert are more fiction than reality." *Chemical Sep'n Tech., Inc. v. U.S.*, 51 Fed. Cl. 771, 812 (Ct. Fed. Cl. 2002).

In view of the parties' material disputes concerning *Wands* factors 2 and 3, summary judgment in Defendant's favor would be inappropriate.

> **c.**   ***Wands* Factors 4-7: The Nature of the Invention, the State of the Art, the relative skill of those in the Art, and the Predictability or Unpredictability of the Art**

Defendant failed to establish the absence of material factual disputes regarding the nature of the invention, the state of the art, and the predictability or unpredictability in the art. *See* D.I. 199, 12, 16. While the parties have agreed to a relatively high level of skill—requiring three years of nanocrystal synthesis and knowledge of laboratory techniques and strategies used in nanocrystal research and synthesis (Ex. A, ¶ 151(6))—they disagree on all other aspects of *Wands* factors 4-7.

Plaintiffs' evidence shows that the nature of the invention of the '051 patent is simple in that it relies on well-known reagents, yet elegant in that it combines them in a method that provides greater control of nanocrystal synthesis. Ex. A, ¶ 5. Plaintiffs evidence further shows that the state of the art was advanced and provided a skilled artisan with extensive knowledge of the claimed classes of reagents and general strategies for the synthesis of colloidal nanocrystals. *Supra*, § II.A.1.#6-#12. As such, the field of art was relatively predictable, and any required testing would have been routine. *Id.* This sharply contrasts with the search for compounds that have unpredictable biological activity, as Plaintiffs evidence shows. *Supra*, IV.A.1.d.

Defendant's disputed counter is the legally erroneous assertion that practicing the invention would be "impossible" given the breadth of the claims. D.I. 13; *Pfizer,* 555 Fed. Appx. at 967. Moreover, Defendant's sole support is its quotation of Dr. Peng stating that he did not think it would be possible to test "every possible combination." D.I. 13. Yet ***in the same response*** (which Defendant truncated), Dr. Peng explained that a skilled artisan "***would not need to do so***" because the patent provides "guidelines" on how to pick, and a skilled artisan would use their "chemical background" and those "guidelines" to practice the method. D.I. 200, Ex. 2, 121:16-122:2. Again, a skilled artisan would have considered this routine, not "complex" as Defendant argues. *See* D.I. 199, 14; *e.g.*, Ex. A, ¶¶ 171, 174, 175, 195.

Defendant next disputes the predictability of nanocrystal synthesis. D.I. 199, 16. Defendant reasons that because the invention was "foundational," a skilled artisan would not have appreciated that "the interaction of the precursors and ligands using non-coordinating solvents to mirror those known in the prior art using coordinating solvents." *Id.* This is disputed. While the invention was "foundational"—and thus widely adopted—the patent provided the skilled artisan with the guidance required to "readily adapt" known methods of forming cation-ligand complexes and synthesizing colloidal nanocrystals in coordinating solvents "to the claimed method using a non-coordinating solvent." Ex. A, ¶ 166; *id.*, ¶ 175(5) (explaining that applying general concepts to the claimed method using a non-coordinating solvent "would have been considered routine as of 2002").

Alleging unpredictability, Defendant relies on "new discoveries" made after the '051 patent and that the claimed methods encompass "chemicals that had been rarely, if at all, studied in the field of semiconductor synthesis," such as "branched carboxylates," which, according to Defendant, were first used in nanocrystal synthesis in 2017. D.I. 199, 16-17. This is inapposite.

"Improvement and selection inventions are ubiquitous in patent law; such developments do not alone cast doubt on enablement of the original invention." *CFMT, Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1340, (Fed. Cir. 2003). It is also disputed. While those in the art may have gained additional knowledge over time, the record establishes that such ligands were used reliably and predictably prior to 2002. Ex. A, ¶¶ 104, 105, 107, 166, 222. Thus, because the cases cited by Defendant in connection with these *Wands* factors focus on "unpredictable" arts and/or "nascent" technology, they do not support nonenablement here. *Supra*, IV.A.1.d (discussing cases); *see Promega Corp. v. Life Techs. Corp.*, 773 F.3d 1338, 1347, 1349 (Fed. Cir. 2014) (determining claims were not enabled where the field of art was "complex" and "unpredictable").

In view of the parties' material disputes concerning *Wands* factors 4-7, summary judgment in Defendant's favor would be inappropriate.

### d. *Wands* Factor 8: The Breadth of the Claims

Defendant failed to show the absence of any material factual disputes regarding the breadth of the claims.

First, Defendant argues that the claims encompass "billions" of potential combinations, citing the testimony of Dr. Peng that "there's probably been in the business [sic, billions] of combinations" of cations precursors, ligands, and non-coordinating solvents.[9] D.I. 199, 13. This does not account, however, for the similarities in families of chemicals, which renders it disputed and inappropriate to tally every possible hypothetical permutation individually. *See* Ex. B, 198:2-19. Nor does Defendant provide basis to substantiate "billions" of permutations. *See generally* D.I. 199. To the contrary, Dr. Owen attested to "roughly 1,755 possible cation ligand complexes"

---

[9] While Defendant purports to identify large numbers of combinations within the claims, it is dispositive that it failed to identify *any* inoperative embodiments. *See generally* D.I. 199; *Atlas Power*, 750 F.2d at 1576-77.

or at most calculated "roughly 14,040 possible *classes* of chemicals."[10] D.I. 200, Ex. 7, ¶¶ 87, 98 (emphasis in original).

Second, even if true, the alleged breadth fails to establish non-enablement as claims directed to even an *infinite* number of embodiments can be enabled. In *Minerals Separation*,[11] the Supreme Court rejected as "untenable" an argument that the patent was invalid because "when different ores are treated[,] preliminary tests must be made to determine the amount of oil and the extent of agitation necessary in order to obtain the best results." 37 S. Ct. at 82. The Court acknowledged that "[t]he composition of ores *varies infinitely*, *each one presenting its special problem*, and it is obviously impossible to specify in a patent the precise treatment which would be most successful and economical in each case." *Id.* Yet the Court determined that "infinite[]" number of ores, each requiring experimentation, did not render the claims invalid. *Id.* As the Court explained, the patent, "while leaving something to the skill of persons applying the invention, is clearly sufficiently definite to guide those skilled in the art to its successful application, as the evidence abundantly shows." *Id.* The question is thus not how many theoretical combinations fall within the scope of the claims, but whether the patent sufficiently guides a skilled artisan to the "successful application" of the claimed method. *Id.*

In view of the parties material disputes concerning *Wands* factor 8, summary judgment in Defendant's favor would be inappropriate.

---

[10] Dr. Owen also did not explain how he arrived at any of these numbers. *Id.*, ¶¶ 87, 98.

[11] *Minerals Separation* was quoted favorably in *Nautilus, Inc. v. BioSig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014), and has also been cited by the Federal Circuit as binding authority. *In re Wands*, 858 F. 2d at 737 n. 19; *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1557 (Fed. Cir. 1983).

### 2.      Summary Judgment of Noninfringement Is Inappropriate

Material factual disputes preclude summary judgement of noninfringement of Defendant's Gen 2 and Gen 2.5 nanocrystals. *Supra*, § II.A.2. The crux of Defendant's noninfringement theory is that octadecene is not a "solvent" unless it is "the main component" in the reaction. D.I. 199, 24. Defendant's argument, attempting to revive an argument it lost, contravenes this Court's claim construction. *See, e.g.* D.I. 200, Ex. 4, ¶ 23 (arguing that the claims of the '051 patent require a non-coordinating "reaction medium"); D.I. 169 (Order on Claim Construction). As this Court determined, the '051 patent claims neither require "using non-coordinating solvents as reaction media" nor "exclude all coordinating solvents." *Markman* Transcript, 52:12-24. Defendant makes no attempt to establish any facts (much less *undisputed* facts) that support noninfringement under the Court's claim construction. *See* D.I. 199, 5, 6, 23-26.

Turning to the facts, Plaintiffs dispute Defendant's assertion that the plain and ordinary meaning of the word "solvent" requires it to be the main component in a reaction medium. D.I. 199, 24. Plaintiffs' evidence shows that this is not how skilled artisans, including Defendant's own scientists, use the term solvent. *Supra*, § II.A.2.#14-#15. And in the context of Defendant's processes, Plaintiffs' evidence shows that octadecene is present as a solvent. *Supra*, § II.A.2.#13.



*Supra*, § II.A.2.#16-#17. Defendant ignores these facts. D.I. 199, 5-6, 23-26.

*See* D.I. 200, Ex. 4, Attachment A, 1-2. This is improper. "Octadecene is a non-coordinating solvent in Nanosys's processes, even if it is not the *only* solvent." Ex. O, ¶ 66.

Defendant seeks to side-step this material factual dispute by mischaracterizing the testimony of Dr. Vela in IPR2020-00503. D.I. 199, 5, 6, 24-26. At his deposition Dr. Vela was asked: "What's the difference between a solvent and a diluent?" D.I. 200, Ex. 3, 108:16-17. Contrary to Defendant, this question was not tied to the claims of the '051 patent, e.g., Dr. Vela was not providing his understanding of the claimed "non-coordinating solvent." *Id.* Rather, when explaining the concept of a solvent versus a diluent, Dr. Vela explained that "[a] solvent is the main component in a homogeneous liquid mixture," while a diluent "is usually something that you use to reduce the amount of something else." *Id.*, 108:18-22. As Dr. Vela explained, when he provided this testimony, he was not addressing reactions involving more than one solvent. Ex. N, ¶ 44; Ex. O, ¶ 65. Those skilled in the art would have appreciated that a solvent may not be the most abundant chemical in a reaction where it is combined with other solvents or where a reaction is performed at very high concentrations. Ex. N, ¶ 43.

Defendant also mischaracterizes Dr. Vela's declaration from IPR2020-00503. D.I. 25-26. In his IPR declaration, Dr. Vela explained that *prior to* the '051 patent, those in the art often used a mixture of coordinating reagents that could function as both coordinating solvents and ligands, such that the prior art at times used the terms interchangeably. D.I. 200, Ex. 15, ¶ 45. By contrast, the '051 patent's *non-coordinating* solvent does not function as a ligand but rather serves only as a solvent (a reaction medium). *Id.*, ¶ 46. Again, Dr. Vela's discussion of prior art coordinating reagents was not defining the term "solvent" in the context of the '051 patent. *Id.*

Finally, Defendant's argument that its "solvent system is nearly identical to the prior art coordinating solvent system" is wrong.[12] D.I. 199, 25. As Dr. Vela explained, the prior art

---

[12] Even if true, the Federal Circuit has "made unequivocally clear… that there is no 'practicing the prior art' defense to literal infringement." *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002).

employed a "*continuously* coordinating reaction medium (comprised of one or more coordinating reagents)," i.e., a reaction with *no non-coordinating solvent*. D.I. 199, 24-25 (quoting testimony).

████████████████████████████████████████████████████ Ex. O, ¶ 66-68; Ex. F, Attachment C, 1-4. And as Dr. Vela explains, the benefits of the claimed method are still achieved, "even when octadecene is not the majority component in the reaction solution." Ex. N, ¶ 39.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

### D.    Conclusion

For the above reasons, Defendant's motions for summary judgement should be denied.

## III.    DEFENDANT'S MOTION TO EXCLUDE SHOULD BE DENIED

Defendant seeks to exclude Mr. Schoettelkotte's testimony on two grounds. D.I. 199, 18-23. First, Defendant claims Mr. Schoettelkotte included non-infringing products in his royalty base. *Id.* at 18-19. Second, Defendant accuses Mr. Schoettelkotte of not properly apportioning the royalty base in his damages analysis. D.I. 199, 20-23. As explained below, both these arguments are legally and factually flawed. Thus, the Court should deny Defendant's motion to exclude the testimony of Mr. Schoettelkotte.

### A.    Factual Background

#### 1.    Facts Relating to the Infringing Products Made by Shoei

As discussed above, Defendant uses the process of the '051 patent to manufacture nanocrystals, also known as "quantum dots." D.I. 129, ¶¶ 6, 24-27; D.I. 204, Ex. A, 2-3. Most of this manufacturing occurs in the U.S., but since this litigation began, Defendant has outsourced part of its manufacturing to Shoei in Japan. D.I. 199, 4. But regardless of where those quantum dots are manufactured, Defendant sells those products from the U.S.

Mr. Russell Kempt, Defendant's Vice President of Worldwide Sales and Marketing, explained the Defendant's sales process for products made by Shoei as follows:



Ex. H, 40:7-17; *see also id.*, 36:4-37:3; 45:8-14; 138:11-140:7 (explaining purchase order process).

Mr. Kempt confirmed that Shoei ████████████████████████████████ *Id.*, 40:1-6



*Id.*, 101:18-102:11.

In sum, Defendant sells these products from the U.S. and as such, those sales are infringing. Therefore, Plaintiffs' damages expert, Mr. Schoettelkotte, appropriately included these sales in his damages analysis. Ex. I, ¶ 136, Ex. 3.1.

### 2.      Facts Relating to Apportionment

The nanocrystals or "quantum dots" sold by Defendant comprise a "core" surrounded by a "shell" grown on the core. *See, e.g.*, D.I. 204, Ex. B, ¶¶ 27, 48, 59. ██████████████████

██████████████████████████████████████████████████ *See id.*, ¶¶ 27-28, 47-48, 58-60, 98-99, 104-05, 118. ████████████████████████████████████

████████████████████████████████████ *See id.*, ¶¶ 76-80, 86-87, 91-92, 109-10, 114-16.

To determine a reasonable royalty for Defendant's sale of these infringing quantum dots, Mr. Schoettelkotte's began his analysis with certain agreements from the University of Arkansas that license the '051 patent ("University Licenses"). Ex. I, ¶¶ 44-66, 123-136. The University Licenses contain royalty rates of ████████████ of net sales of products covered by the licensed patents or manufactured by a process covered by the licensed patents. *Id.*, ¶¶ 46, 54, 62; Ex. J, ¶¶ 17-18.

For each of these agreements, Mr. Schoettelkotte considered their technical and economic comparability. *Id.*, ¶¶48-49, 55-56; 64-65, 128. Mr. Schoettelkotte also spoke about the University Licenses with Dr. David Hinton, the Associate Director of the Technology Ventures Department at the University of Arkansas, who has responsibility for the University Licenses. Dr. Hinton informed him that, under the University Licenses, ████████████████████████████████

████████████████████████████████████████. Ex. J, ¶¶ 17-18. He also explained that while certain provisions in the University Licenses ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████. In those instances, ████████████████████████████

28

██████ *Id.* With this information in hand, Mr. Schoettelkotte used the rates and royalty base in the University Licenses as the starting point of his analysis. Ex. I, ¶¶ 126, 128.

From that starting point, Mr. Schoettelkotte then used a *Georgia-Pacific* analysis to further adjust the royalty rate. *Id.* at ¶¶ 67-126. For example, Mr. Schoettelkotte considered that the following factors exerted upward pressure on the royalty rate: the competitive nature of the parties, the commercial success of the products, the advantages the '051 patent provided over prior art, the fact that the patented technology was considered foundational, and the lack of non-infringing alternatives. *Id.* at ¶¶ 81-91, 94-115, 128-132. He also considered factors that exerted downward pressure. *Id.* at ¶¶ 121-122, 133. In particular, he considered that factors unrelated to the '051 patent "contribute to the sale, success, and profitability of the Accused Products sold by Defendant." *Id.*, ¶ 121. As part of this analysis, he noted that even though the University of Arkansas agreements included "built-in apportionment," these factors would exert downward pressure on the royalty rate. *Id.*, ¶ 122.

Based on this analysis, Mr. Schoettelkotte determined that the parties would have considered a royalty range of ██████ to be reasonable. *Id.*, ¶ 135. Moreover, due to the factors discussed above, he determined the parties would have agreed to a royalty at the high end of that range. *Id.* at ¶135. He also determined that the royalty would apply to Nanosys's net sales of quantum dots, the same royalty base used in the University Licenses. *Id.*

### B.    Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of qualified expert testimony. Under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and Rule 702, the Court considers "a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Shire ViroPharma Inc. v. CSL Behring LLC*, No. 17-414, 2021 WL 1227097, at *2 (D. Del. Mar. 31, 2021). But Rule 702 "'has a liberal policy of admissibility[,]' " *Pineda v. Ford Motor Co.*, 520

F.3d 237, 243 (3d Cir. 2008) (citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017) (*quoting Daubert*, 509 U.S. at 596, 113 S. Ct. 2786).

### C.  Argument

#### 1.  Mr. Schoettelkotte Properly Included Infringing Sales in the Royalty Base

Defendant first claims that Mr. Schoettelkotte improperly included in his royalty base certain products manufactured and delivered to customers outside the U.S. by Defendant's contract manufacturer Shoei. D.I. 199, 18-19. Defendant's motion assumes that because these products were delivered by Shoei outside the U.S., the "sale" of those products necessarily occurred outside the U.S. *Id.* But these products were not sold to customers by Shoei in Japan—they were sold by Defendant *in the U.S.*, which is an act of infringement under § 271(g) *Supra*, § III.A.1; 35 U.S.C. § 271(g) ("Whosoever without authority imports into the United States **or offers to sell, sells or uses within the United States** a product which is made by a process patented in the United States shall be liable as an infringer"); *see also Genentech, Inc. v. Amgen Inc.*, No. 17-1407-CFC, 2020 WL 708433, *1-*2 (D. Del. Feb. 12, 2020) ("The use of the disjunctive makes clear that importation is not required to establish infringement liability under § 271(g).").

To the extent there is a dispute regarding where the sale of these products occurred and, thus, whether these products infringe, that is not an issue with Mr. Schoettelkotte's "qualification, reliability, and fit." *Shire ViroPharma Inc. v. CSL Behring LLC*, No. 17-414, 2021 WL 1227097, at *2 (D. Del. Mar. 31, 2021) (Under *Daubert*, the Court considers "a trilogy of restrictions on expert testimony: qualification, reliability, and fit."). It is a factual and legal dispute regarding

whether sales of certain products by Defendant were an act of infringement. If Defendant wanted a determination of non-infringement as to these products, it should have moved for summary judgment. A *Daubert* motion, however, is not the proper vehicle to resolve this dispute. *See Micro Chemical Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("When…the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *see also IOENGINE, LLC v. PayPal Holdings, Inc.*, No. 18-452-WCB, 2022 WL 2800861, at *28 (D. Del. June 15, 2022) (denying *Daubert* motion where underlying issue was a factual dispute and not one of "qualification, reliability, and fit."); *Shire*, 2021 WL 1227097, at *28 (challenge to "underlying assumptions" and "not the methodology" is not a *Daubert* issue). Thus, for this reason alone, Defendant's motion should be denied.

To the extent the Court considers the merits of Defendant's non-infringement arguments, however, those arguments fare no better. In determining the location of an infringing sale, the Federal Circuit has explained that "the standards for determining where a sale may be said to occur do not pinpoint a single, universally applicable fact that determines the answer, and it is not even settled whether a sale can have more than one location." *Carnegie Mellon University v. Marvell Technology Group*, 807 F.3d 1283, 1308 (Fed. Cir. 2015) (granting new trial as to whether products made, used, and delivered abroad were sold in the U.S.). In fact, there are several places of potential relevance to where a sale may occur including "a place of inking the legal commitment to buy and sell and a place of delivery, and perhaps also a place where other 'substantial activities of the sales transactions' occurred." *Id.* (internal citations omitted.) For this reason, even products that have been manufactured, used, and delivered abroad may be found to have been sold in the U.S. when there is a "substantial level of sales activity…within the United States." *Id.* at 1309-10.

In this case, there is strong evidence that Defendant



These activities are more than sufficient to permit a jury to find that Defendant sold these products in the U.S. For example, in *Carnegie Mellon*, the Federal Circuit refused to grant JMOL to an accused infringer regarding products "manufactured, delivered, and used entirely abroad" because, on the record, a jury could have found the products to have been sold in the U.S. 807 F.3d at 1309-10. In reaching its decision, the court noted that there was a "substantial level of sales activity…within the United States, even for chips, manufactured, delivered, and used abroad." *Id.* This included evidence "suggesting that specific contractual commitments for specific volumes of chips were made in the United States." *Id.*at 1309.[13] Notably, in this case, Nanosys

*Id.* at 84:14-87:8; 138:11-140:7. Other courts similarly have

---

[13] In fact, in a later case, *Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304 (Fed. Cir. 2018) *("TAOS")*, the Federal Circuit noted these contractual commitments as one of the reasons it denied JMOL in *Carnegie*.

held that substantial sales activity in the U.S. can result in a sale in the U.S. even where products are manufactured and delivered abroad. *See California Inst. of Tech. v. Broadcom Ltd.*, No. CV 16-3714-GW(AGRx), 2019 WL 11828237, at *3-*8 (C.D. Cal. June 17, 2019) *aff'd in part and vacated in part* 25 F.4th 976 (Fed. Cir. 2022) (denying summary judgment due to existence of questions of fact as to whether products manufactured and delivered abroad were sold within the U.S.); *see also Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*, No. 2:16-cv-00134-JRG, 2017 WL 2869332, at *2-*3 (E.D. Tex. May 18, 2017) (same).

In its motion, Defendant assumes that because the products were delivered abroad, those products were "sold" abroad. But as explained above, that is not the law. *Carnegie Mellon*, 807 F.3d at 1309-10. And the facts of this case are readily distinguishable from the cases cited by Defendant. For example, in *Syngenta Crop Protection v. Willowood, LLC*, 944 F.3d 1344 (Fed. Cir. 2019), the court found only that the defendant's foreign affiliate did not import or sell infringing product in the U.S. But in the present case, it is a U.S. entity, Defendant, conducting activity from the U.S. that is accused of infringement. Similarly, in *Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, 711 F.3d 1348 (Fed. Cir. 2013), the court did not address what qualifies as a sale in the U.S. because it was undisputed that the plaintiff was seeking damages for sales outside the U.S. *Id.* at 1370-71. And in *Standard Havens Products, Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360 (Fed. Cir. 1991), the court focused on whether a foreign entity "shipped" products to the U.S. under 271(g) and not the location of the sale of those products. *Id.*at 1374.[14] For these additional reasons, Defendant's motion should be denied.

---

[14] While not cited by Defendant, the current case is also distinguishable from other cases finding that products delivered abroad were not sold in the U.S. *See, e.g., TAOS*, 895 F.3d 1304; *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 831 F.3d 1369 (Fed. Cir. 2016); *M2M Solutions LLC v. Motorola Solutions Inc.*, No. 12-33-RGA, 2016 WL 70814 (D. Del. Jan. 1, 2016). For

### 2. Mr. Schoettelkotte Properly Apportioned

Defendant next accuses Mr. Schoettelkotte of failing to properly apportion. D.I. 199, 20-23. But this is also incorrect. As explained below, Mr. Schoettelkotte properly relied on comparable licenses containing "built-in apportionment," including licenses to the '051 patent and accounted for the value of any non-infringing features as part of his analysis.

### a. The Apportionment Methodology Used by Mr. Schoettelkotte Comports with Federal Circuit Precedent

The Federal Circuit requires apportionment when "the accused technology does not make up the whole of the accused product." *Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1376 (2020). But it is the "ultimate combination of royalty base *and royalty rate* [that] must reflect the value attributable to the infringing features." *Id.* (emphasis added). Moreover, "when a sufficiently comparable license is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required." *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020); *see also Pavo Solutions LLC v. Kingston Technology Company, Inc.*, 35 F.4th 1367, 1380 (2022). "That is because a damages theory that is dependent on a comparable license…may in some cases have 'built-in apportionment.'" *Id.* Therefore, "a party relying on a sufficiently comparable license can adopt the comparable license's royalty rate and royalty base

<hr/>

example, in *Halo*, the defendants entered into pricing and contracting negotiations in the U.S., but the final formation of the sales contract including the essential terms were contained in purchase orders received overseas. ████████████████████ Ex. H, 84:14-87:8; 138:11-141:4. Similarly, in *TAOS*, the plaintiff "failed to present any evidence establishing the required domestic activity." *Id.*at 1330-31. Here, the testimony of Defendant's corporate witness establishes ████████████ And in *M2M Solutions*, this Court focused primarily on whether infringing products made and delivered abroad ultimately entered the U.S. and not whether substantial sales activity occurred in the U.S. *Id.* at 19-22. Moreover, while decided a few months after the Federal Circuit's decision in *Carnegie Mellon*, the Court's decision in *M2M Solutions* does not cite to that case suggesting that the parties may have failed to bring the import of that case to the Court's attention.

without further apportionment and without proving that the infringing feature was responsible for the entire market value of the accused product." *Id.* at 1041. This is exactly the process Mr. Schoettelkotte followed in this case.

As described above, Mr. Schoettelkotte's analysis began with the University Licenses. Ex. I, ¶¶ 44-66, 123-136. Given that these agreements include the '051 patent and apply to the same types of products as the accused products, it is beyond dispute that these agreements are "comparable licenses."[15] Nevertheless, he also analyzed both the technical and economic comparability of the licenses. *Id.*, ¶¶ 48-49, 55-56, 64-65, 128. He then analyzed the *Georgia-Pacific* factors to adjust the rate, taking into account factors that exerted upward and downward pressure on the royalty rate. Both the Federal Circuit and this Court have repeatedly approved of this approach. *See, e.g., Vectura*, 981 F.3d at 1040 (finding royalty rate in comparable license agreements did not require further apportionment); *Pavo Solutions,* 35 F.4th at 1380 (comparable license for the patent-in-suit provided "sufficient evidence of 'already built[-]in apportionment'"); *Board of Regents University of Texas System v. Boston Scientific Corp.*, No. 18-392-GBW, 2022 WL 17584180, at *5-*6 (D. Del. Dec. 12, 2022) (denying Daubert motion on apportionment where expert relied on comparable licenses containing built-in apportionment); *RSB Spine, LLC v. DePuy Synthes Sales, Inc.,* No. 19-1515-RGA, 2022 WL 17084156, at *2 (D. Del. Nov. 18, 2022) (denying Daubert motion on apportionment where expert relied on licenses for the same patents and similar products); *Vectura Ltd. v. Glaxosmithkline LLC*, 397 F.Supp.3d 579, 593-94 (D. Del. 2019) (denying Daubert motion on apportionment where "proper apportionment or valuation of

---

[15] In fact, Defendant's expert also relied on a subset of the University Licenses for her own royalty analysis. Ex. K, 14-27, 47-48.

the patent can be derived from comparable licensing agreements). Mr. Schoettelkotte's analysis comports with the legal precedent, and his testimony is reliable and admissible.

### b. Defendant's Criticisms of Mr. Schoettelkotte's Analysis Are Meritless

Rather than address the concept of built-in apportionment in its motion[16], Defendant takes a scattershot approach to attacking Mr. Schoettelkotte's conclusions alternating between complaints about the royalty rate and the royalty base used by Mr. Schoettelkotte. But none of these critiques supports excluding Mr. Schoettelkotte's testimony.

For example, Defendant claims that Mr. Schoettelkotte did not properly quantify how he arrived at his ███████. D.I. 199, 21. But as discussed above, Mr. Schoettelkotte explained how he began with comparable licenses and then applied a *Georgia-Pacific* analysis in line with Federal Circuit precedent. Further, the Federal Circuit has held that "there is no blanket rule of *quantitative* apportionment in every comparable license case." *Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1376 (Fed. Cir. 2020). Moreover, it has expressly approved the use of *Georgia Pacific* factors to make those adjustments just as Mr. Schoettelkotte did here. *Exmark Manufacturing Company Inc. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1348-49 (Fed. Cir. 2018) ("one possible way" of apportioning is "through a proper analysis of the *Georgia–Pacific* factors"). Thus, this criticism misses the mark.

Next, Defendant claims Mr. Schoettelkotte ignored aspects of the accused products not associated with the patent and failed to do a "quantitative analysis" of these other aspects. D.I. 199, 22. But again, this is inaccurate. In his report, Mr. Schoettelkotte specifically noted these additional

---

[16] Perhaps recognizing the barrier these cases present to its motion, Defendant fails to address the concept of a built-in apportionment at all in its brief. It also fails to cite to any of the recent Federal Circuit cases on this point. D.I. 199, 20-23.

features and considered them as part of his *Georgia-Pacific* analysis. Ex. I, ¶¶ 121-122, 133. Moreover, as noted above, the Federal Circuit does not require a quantitative apportionment analysis. *Bio-Rad Laboratories*, 967 F.3d at 1376. And the lack of "quantitative analysis does not preclude admissibility." *Board of Regents*, 2022 WL 17584180, at *4. "Indeed, 'it may be impossible to quantitatively determine the exact percentage of a royalty rate that corresponds to each component of a licensed product." *Id.* (q*uoting Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-152-RGA, 2018 WL 5729732, at *2 (D. Del. Nov. 2, 2018)).

Finally, Defendant claims that Mr. Schoettelkotte could not have properly apportioned because his royalty rate does not change if the patented process is used to manufacture both the core and shell of a nanocrystal or just the shell of a nanocrystal. D.I. 199, 20. Defendant ignores the fact that Mr. Schoettelkotte used the same approach as the comparable University Licenses. Defendant incorrectly assumes that the parties would have charged different rates if the process were used to manufacture both cores and shells as opposed to just shells. There is no evidence in the agreements to support this assumption. In fact, Dr. Hinton from the University expressly told Mr. Schoettelkotte that this is not the case. Ex. J, ¶¶ 17-18. This argument also ignores the evidence considered by Mr. Schoettelkotte regarding the critical importance of the shell. Ex. I, ¶ 120; Ex. J, ¶ 20.

Faced with these facts, Defendant disputes the interpretation of these comparable licenses. But, as discussed above, disputes over the facts underlying an opinion cannot be resolved on a *Daubert* motion. *See Micro Chemical Inc.* 317 F.3d at 1392; *IOENGINE*, 2022 WL 2800861, at *28; *Shire*, 2021 WL 1227097, at *28. So, on this basis alone, this argument should be dismissed. But even if the Court was to consider the merits of this argument, Defendant's interpretation is contrary to the evidence

Specifically, Defendant asserts that the University Licenses include a provision that requires the licensee to ███████████████████████████ D.I. 199, 22-23. But this is not accurate. As explained by Dr. Hinton, the provision in question applies when ██████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████. Ex. J, ¶¶ 17-18. In those instances, ████████████████████ ██████████████████████████████████████. *Id.*

The fact that the provision mentions ████████████████████████ ████████████████████████████████████████████████. All the accused products use shells made by the infringing process. So, even if the provision operated as Defendant claims, this would never be applicable to the accused products. Moreover, Defendant's interpretation would require the provision to permit the deduction of the price of a core not covered by the licensed patents. Given the relative importance of the core of a nanocrystal, if the parties intended to permit such a deduction it would have been made explicit. But notably, the provision says nothing about deducting the price of "cores" not covered by the licensed patents.

Finally, Defendant's reliance on this provision is particularly unconvincing given that when its own expert sought to apportion the royalty base, she did not use the method found in this provision. Ex. K, 12-13; Ex. M, 113:8-120:1. Given that the University Licenses are indisputably comparable, if the provision operated as Defendant claims, one would expect Defendant's expert would have relied on the method dictated by that provision. But she did not.

### D.     Conclusion

For these reasons, the Court should deny Defendant's motion to exclude the testimony of Mr. Schoettelkotte.

*Of Counsel*:

Qingyu Yin
Mark Feldstein
Brian Kacedon
Rajeev Gupta
Karthik Kumar
Yieyie Yang
FINNEGAN, HENDERSON, FARABOW, GARRETT
& DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000
nncrystal-ua-ddel@finnegan.com

Maximilienne Giannelli
FINNEGAN, HENDERSON, FARABOW, GARRETT
& DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190
(571) 203-2700
nncrystal-ua-ddel@finnegan.com

Dated: January 30, 2023

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Nicole K. Pedi (#6236)
Tyler E. Cragg (#6398)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
pedi@rlf.com
cragg@rlf.com

*Attorneys for Plaintiffs NNCrystal US
Corporation and The Board of Trustees of the
University of Arkansas*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 30, 2023, true and correct copies of the foregoing document

were served upon the following attorneys of record by electronic mail:

Karen E. Keller
David M. Fry
Nathan R. Hoeschen
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
dfry@shawkeller.com
nhoeschen@shawkeller.com

Douglas E. Lumish
LATHAM & WATKINS
140 Scott Drive
Menlo Park, CA 94025
(650) 463-2633
doug.lumish@lw.com

Clement Naples
LATHAM & WATKINS
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1331
clement.naples@lw.com

Sami K. Al-Marzoog
LATHAM & WATKINS
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2198
sami.almarzoog@lw.com

*/s/ Nicole K. Pedi*
Nicole K. Pedi (#6236)
pedi@rlf.com